IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
ex rel SOUTHWOODS HOLDING LLC

      Plaintiff,

v

                                   Case No. 8:19-2761-T-24SPF
                                   FILED IN CAMERA
                                   UNDER SEAL

BENZER FRANCHISING, LLC,
BENZER PHARMACY HOLDING LLC,
MANISH PATEL, ALPESH PATEL,
AJ NILKANTH GOKUL LLC,
AJ GOKUL NILKANTH LLC, ALAWRASS LLC,
NEW HAVEN PHARMACY LLC,
PREMIER CARE PHARMACY LLC,
ALPHA TOUCH PHARMACY, INC.,
KENNEDY DRUGS LLC,
VICTORY PHARMACY OF DECATUR INC.,
VINESH DARJI, HYPE MED, LLC, ERIC VANVLEET,
NHS PHARMA, INC., SINIKKA GREEN,
GULF COAST PHARMACEUTICALS PLUS,
REDMOND AND GREER PHARMACY SUPPLY, INC.,
MEDCILLARY MED GROUP LLC D/B/A MEDCILLARY,
TELEMEDICINE CORP., ONE LIFE HEALTH SOURCE LLC,
SAFE CHAIN SOLUTIONS, LLC,
GREER AND VEGA MEDICAL LLC, DARIN VEGA,
BENASOURCE LLC, MTK MARKETING LLC,
THOMAS W. KUENZLER AND MICHAEL F. KUENZLER

      Defendants.
_____/

## FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND

Relator SOUTHWOODS HOLDING LLC ("Relator") brings a qui tam action on behalf of the

United States of America (the "United States") under the False Claims Act, 31 U.S.C. §3729

et seq. (the "FCA"), and the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b) (the "AKS"), to

recover treble the damages actually sustained by, and civil penalties and restitution owed to,

the United States as a result of a scheme by Defendants BENZER FRANCHISING, LLC, BENZER PHARMACY HOLDING LLC, MANISH PATEL, ALPESH PATEL, AJ NILKANTH GOKUL LLC, AJ GOKUL NILKANTH LLC, ALAWRASS LLC, NEW HAVEN PHARMACY LLC, PREMIER CARE PHARMACY LLC,  ALPHA TOUCH PHARMACY, INC., KENNEDY DRUGS LLC, VICTORY PHARMACY OF DECATUR INC, VINESH DARJI, HYPE MED, LLC, ERIC VANVLEET, NHS PHARMA, INC, SINIKKA GREEN, GULF COAST PHARMACEUTICALS PLUS, REDMOND AND GREER PHARMACY SUPPLY, INC, MEDCILLARY MED GROUP LLC d/b/a MEDCILLARY, TELEMEDICINE CORP., ONE LIFE HEALTH SOURCE LLC,  SAFE CHAIN SOLUTIONS, LLC,  GREER AND VEGA MEDICAL LLC, DARIN VEGA BENASOURCE LLC, MTK MARKETING LLC, THOMAS W. KUENZLER AND MICHAEL F. KUENZLER (collectively "Defendants") to commit fraud against the Medicare and TRICARE program.

## I.      INTRODUCTION

1.      As set forth in detail below, Defendants have engaged in an illegal scheme to knowingly present, and cause to be presented, false or fraudulent claims for compounded drugs for which they received payments from Medicare and TRICARE.  A substantial amount of these payments was obtained through fraudulent means because Defendants submitted claims that were (a) conducted without meeting the requirements necessary for health insurance coverage; (b) not medically necessary; and/or (c) induced by offers of remuneration in violation of the AKS.

2.      In carrying out this fraud, Defendants knowingly (a) presented or caused to be presented false claims to obtain payments; (b) made or caused to be made or used false records

2

or statements material to these false claims; (c) conspired to cause these claims to be presented and/or these records or statements to be made or used; and (d) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property.

3.    As set forth below, as part of this scheme, Defendants engaged in a scheme to have pharmacies fill prescriptions and knowingly submit and/or caused the submission of claims to Medicare and TRICARE for reimbursement for compounded drugs that were false or fraudulent because they were tainted by kickbacks to marketers. Specifically, Defendants shared a percentage of the profits – the kickbacks – with the marketing and billing companies that generated referrals. In addition, the Defendants knew, or should have known based on the quantity of prescriptions approved and their own control over the type of prescriptions issued, that the prescriptions underlying the claims for reimbursement did not arise from valid prescriber-patient relationships and were not medically necessary, rendering the claims false.

4.    This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. §3730(b)(2). It will not be served on Defendants unless and until the Court so orders. A copy of the Complaint, along with written disclosure of substantially all material evidence and information that Relator possesses, has been served upon the Attorney General of the United States and on the United States Attorney for the Middle District of Florida pursuant to 31 U.S.C. §3730(b)(2) and Fed. R. Civ. P. 4(d).

## II.    PARTIES

5.    Plaintiff the United States of America brings this action by and through Relator. At all times relevant to this Complaint, the United States, acting through the Centers for

Medicare & Medicaid Services ("CMS") and the Defense Health Agency ("DHA"), has reimbursed Defendants for the provision of various medications for eligible individuals through the Medicare and TRICARE programs.

6.    The United States brings this action on behalf of its agencies, CMS and Health and Human Services ("HHS") on behalf of the Medicare program and the DHA, a component of the Department of Defense, for TRICARE (formerly known as CHAMPUS) which is a federal health care program, as defined in the AKS, 42 U.S.C. §1320a-7b, which is administered by DHA, and provides health care insurance for active duty military personnel, military retirees, and military dependents.

7.    Relator is a Florida corporation who brings this action on behalf of itself and the United States.

8.    Beginning in 2018, Defendant Benzer Pharmacy Holding LLC engaged Relator to assist in consulting with a corporate store located in Naples, Florida.  The scope of the consulting quickly grew and Relator began to consult with the franchise pharmacies of Defendant Benzer.

9.    As a result of Relator's association with Defendant Benzer, Relator became aware of Defendant Benzer's "Revenue Projects," which appeared to Relator to be a plan to have Defendant Benzer's franchise pharmacies become part of a wide-ranging plan of defrauding Medicare and TRICARE.

10.    Defendant Benzer Franchising, LLC is the franchising portion of Defendant Benzer Pharmacy Holding LLC.  Both entities are located at 5908 Breckenridge Pkwy, Tampa, Florida and will be referred to collectively as Defendant Benzer.

11.     Defendant Manish Patel is the Chief Executive Officer of Defendant Benzer Pharmacy Holding LLC and a manager of many of the other related entities.

12.     Defendant Alpesh Patel is the Chief Executive Officer of Defendant Benzer Pharmacy Holding LLC and a manager of many of the other related entities

13.     Defendant AJ Nilkanth Gokul LLC is the corporate name of the Benzer Pharmacy franchise operating at 219 Dewey Ave, Poteau, Oklahoma.

14.     Defendant AJ Gokul Nilkanth LLC is the corporate name of the Benzer Pharmacy franchise operating at 28455 Tomball Pkwy, Tomball, Texas.

15.     Defendant Alawrass LLC is the corporate name of the Benzer Pharmacy franchise operating at 803 E Prien Lake Rd, Lake Charles, Louisiana.

16.     Defendant New Haven Pharmacy LLC is the corporate name of the Benzer Pharmacy franchise operating 307 5th St, New Haven, West Virginia.

17.     Defendant Premier Care Pharmacy LLC is the corporate name of the Benzer Pharmacy franchise operating at 867 W Town St., Columbus, Ohio.

18.     Defendant Alpha Touch Pharmacy, Inc. is the corporate name of the Benzer Pharmacy franchise operating at 10071 Pines Blvd, Suite D, Pembroke Pines, Florida.

19.     Defendant Kennedy Drugs LLC is the corporate name of the Benzer Pharmacy franchise operating at 3196 Kennedy Blvd, Union City, New Jersey.

20.     Defendant Victory Pharmacy Of Decatur Inc is the corporate name of the Benzer Pharmacy franchise operating at 1837 River Oaks Rd, Calumet City, Illinois.

21.     Defendant Greer and Vega Medical LLC is the corporate name of the Benzer Pharmacy franchise operating at 3170 Dauphin St., Mobile, Alabama.

22.     Defendant Darin Vega is the owner of Greer and Vega LLC.

23.     Defendant Vinesh Darji is the President of Defendant Benzer Franchising, LLC and a part owner of New Haven Pharmacy LLC. [1]

24.     Defendant Hype Med, LLC based in California, is a pharmaceutical sales and marketing company that makes outbound calls to elderly patients for the purposes of soliciting them to get prescriptions for unnecessary medications.

25.     Defendant Eric VanVleet is the Chief Executive Officer of Defendant Hype Med, LLC.

26.     Defendant NHS Pharma, Inc., is a California corporation, located at 506 W. Mission, Suite 202, Escondido, California.

27.     Defendant Sinikka Green is a medical doctor who is approving the fraudulent footbath prescriptions.

28.     Defendant Conclave Media, LLC, a Delaware Corporation, also known as Conclave Medicine, is a telemedicine business owned by David Santana.

29.     Defendant Gulf Coast Pharmaceuticals Plus is a supplier of medications, including the medications utilized for the fraudulent footbaths.

30.     Defendant Redmond and Greer Pharmacy Supply is a supplier of wholesale pharmaceuticals located at 6060 N Central Expy Suite 770, Dallas, TX 75206.

31.     Defendant Medcillary Med Group d/b/a Medcillary is located at 8330 LBJ Freeway, Suite 1035, Dallas, TX 75243 and purports to offer management services to pharmacies.

---

[1]     Upon information and belief, Darji is a convicted felon. *See* U.S. v. Darji, 609 Fed. Appx. 320 (6th Cir. 2015).

32.     Defendant Telemedicine Corp. is a corporation located at 900 N. Federal Hwy, Suite 306, Hallandale Beach, FL 33009 which is a supplier of telemedicine doctors.

33.     Defendant One Life Health Source, LLC is a Florida corporation located at 255 Primera Blvd., Suite 160, Lake Mary, FL 32746.

34.     Defendant Safe Chain Solutions, LLC is located at 822 Chesapeake Drive, Cambridge, MD 21613.

35.     Defendant BenaSource LLC is located at 5908 Breckenridge Parkway, Tampa, FL 33610 and is operated by Defendants Vinesh Darji and Alpesh Patel.

36.     Defendant MTK Marketing LLC is located at 10585 Mendocino Lane, Boca Raton, FL 33428 and is owned and operated by Defendants Thomas W. Kuenzler and Michael F. Kuenzler.

### III.     JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, because this action is brought for violations of the False Claims Act, 31 U.S.C. §3729 et seq. (as amended), a federal statute.

38.     The Court has personal jurisdiction over Defendants because Defendants (a) are residents of and/or transact business in this District; and (b) have carried out the fraudulent scheme in this District.

39.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391 (b)(2), because Defendants can be found in, is licensed to do business in, and transacts or has transacted business in this District, and the events and omissions that give rise to these claims have occurred in this District.

40.     The Complaint has been filed within the period prescribed by 31 U.S.C. §§3731(b) and 3730(h)(3).

## IV.    NO PUBLIC DISCLOSURE; DIRECT AND INDEPENDENT KNOWLEDGE OF VIOLATIONS OF THE FALSE CLAIMS ACT

41.     There has been no public disclosure, relevant under 31 U.S.C. §3730(e), of the "allegations or transactions" in this Complaint.

42.     Relator makes the allegations in this Complaint based on its knowledge, experience and observations.

43.     Relator is the original source of the information on which the allegations herein are based, has direct and independent knowledge of such information, and has voluntarily disclosed such information to the United States.

## V.    BACKGROUND

### A.    Background on the FCA and AKS

44.     The FCA establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. §3729(a)(1)(A). "Knowingly" is defined to include actual knowledge, reckless disregard, or deliberate indifference. *Id.* at §3729(b)(1). No proof of specific intent to defraud is required. *Id.*

45.     The Anti-Kickback Statute ("AKS") arose out of congressional concern that inducements may corrupt patient and professional health care decision-making, impose higher costs on federal health care programs, and divert federal funds towards goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the federal health care programs from these harms, Congress enacted a prohibition

against the payment of kickbacks in any form. The AKS makes it illegal for an individual or entity to knowingly or willfully:

> [O]ffer[] or pay [] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A)   to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)   to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

46.   A claim for reimbursement from a federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. §1320A-7b(g).

47.   The AKS contains several exceptions in which the prohibition against providing compensation in exchange for referrals or orders do not apply. The "bona fide employment" exception provides that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate the AKS. 42 U.S.C. §1320a- 7b(b)(3)(B). This type of compensation to bona fide employees is exempt from the statute's prohibitions because the control that employers exercise over bona fide employees reduces the potential for abuse. *See* Medicare and State Health

Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952 (July 29, 1991).

48.    The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at l (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)    conspires to commit a violation of subparagraph (A) [or] (8) ... [or]

    * * *

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

31 U.S.C. §3729(a)(1).

49.    The FCA defines a "claim" to include, in pertinent part:

(A)    ... any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that -

(i)    is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or

property is to be spent or used on the Government's behalf or to advance a

Government program or interest, and if the United States Government -

(I)    provides or has provided any portion of the money or property requested

or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient any portion of

the money or property which is requested or demanded .. .

*Id.* §3729(b)(2) (emphasis added).

50.    "Knowing," within the meaning of the FCA, is defined to include reckless

disregard and deliberate indifference. *Id.* §3729(b)(I).

51.    In addition to treble damages, the FCA also provides for assessment or a civil

penalty for each violation or each false claim.

52.    The FCA provides for payment of a percentage of the United States' recovery

to a private individual who brings suit on behalf of the United States under the FCA. *See* 31

U.S.C. §3730(d).

**B.    Background on Medicare Part D**

53.    Congress established Medicare in 1965 to provide health insurance coverage

for people aged sixty-five or older and for people with certain disabilities or afflictions. *See* 42

U.S.C. §§426, 426a.

54.    Medicare is funded by the federal government and administered by CMS, which

is part of HHS.

55.    In 2003, Congress passed the Medicare Prescription Drug, Improvement, and

Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary

prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Medicare Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits under Medicare Part A or enrolled under Medicare Part B. 42 U.S.C. §1395w-l01(a)(3)(A); 42 C.F.R. §423.30(a).

56.     Medicare Part D coverage is based on a private market model. Under Medicare Part D, Medicare contracts with private entities, known as Part D Plan "Sponsors," to administer prescription drug plans. A Part D Plan Sponsor may be either a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan, a Program of All-inclusive Care for the Elderly (PACE) organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. §423.4.

57.     Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. The Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts. Part D Sponsors, in turn, enter into subcontracts with pharmacies or other downstream entities to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.

58.     Medicare Part D covers only drugs that are prescribed for a "medically accepted indication," which, in general, means a use that is (1) approved by the U.S. Food & Drug Administration ("FDA") under the Food Drug and Cosmetic Act, or (2) supported by one or more citations in one of the following compendia: American Hospital Formulary Service Drug Information, United States Pharmacopeia-Drug Information (or its successor), or DRUGDEX Information System (collectively, the "compendia"). See 42 U.S.C. §§1395w-102(e)(1), (e)(4), 1396r-8(g)(1)(B), (k)(6); 42 C.F.R. §423.100.

59.     With respect to compounded drugs, only the ingredients of the compound that are dispensed for a "medically accepted indication" are eligible for reimbursement under Medicare Part D. See Medicare Program; Medicare Prescription Drug Benefit; Final Rule, 70 Fed. Reg. 4,194 at 4,231–32 (Jan. 28, 2005).

**C.     Reimbursement Claims under Medicare Part D**

60.     When a pharmacy dispenses drugs to a Part D beneficiary, the pharmacy submits a claim electronically to the beneficiary's Part D Sponsor. The pharmacy receives reimbursement from the CMS-funded Part D Sponsor for the portion of the covered drug cost not paid by the Part D beneficiary at the point of sale. Sometimes a pharmacy benefit manager, or "PBM," serves as an intermediary between the Part D Sponsor and the pharmacy.

61.     In general, the Part D Sponsor reimburses the pharmacy for compounded drugs based on a negotiated price for each covered ingredient based on common drug pricing benchmarks, including the average wholesale price, wholesale acquisition cost, or maximum allowable cost. The reimbursement amount also is based in part on the quantity of each covered ingredient in the compounded drug.

62.     The Part D Sponsor is required to submit to CMS an electronic notification of the drug dispensing event, called the Prescription Drug Event ("PDE"), which contains data regarding the Medicare prescription drug claim, including the drug dispensed, the quantity dispensed, whether the drug is a compound, the service provider that dispensed the drug, the prescriber, the patient, the amount paid to the pharmacy, the copayment amount, and whether the drug is covered under Medicare Part D.

63.     Certain information in the PDE is derived from the representations that the pharmacy makes when it submits the reimbursement claim to a Medicare Part D Sponsor.

These representations include the drug dispensed, the quantity dispensed, whether the drug was a compound, the service provider that dispensed the drug, the prescriber, and the patient.

64.     Although the PDE record contains a field that indicates if a drug is a compound, the PDE record does not contain a route of administration field that indicates whether the compounded drug is intended for oral or topical use. Likewise, the PDE record does not contain a diagnosis code.

65.     If the drug is a compounded drug containing multiple ingredients, the most expensive Part D ingredient in the compound is reported in the PDE record.  In addition, the total quantity of all the ingredients in a compound is reported in the PDE record.  Although the pharmacy submits the quantity of each individual ingredient to the Part D Sponsor to be used to determine the amount of Medicare reimbursement the Part D Sponsor pays to the pharmacy, the quantity of each individual ingredient in a compounded drug is not reported to CMS in the PDE record.

66.     Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program.

67.     Generating and submitting PDE claims data is necessary for CMS to administer the Part D program and make payments to Part D Plan Sponsors to reimburse them for qualified prescription drug coverage that they provide to Medicare beneficiaries.  Generating and submitting PDE data is a condition of payment for CMS's provision of Medicare funds to Part D Plan Sponsors. See 42 C.F.R. §423.322.

14

68.     CMS pays for Medicare beneficiaries' drugs through several payment mechanisms.  First, Medicare pays a direct subsidy (a capitated payment) to the Part D Plan Sponsor in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R. §423.329(b), minus a monthly beneficiary premium as determined in 42 C.F.R. §423.315(b).  In other words, CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary enrolled in the plan.

69.     Second, CMS makes payments to the Part D Plan Sponsor for premium and cost-sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. §423.780 and 423.782.  Cost-sharing subsidies for qualifying low-income individuals are called the Low-Income Subsidy ("LIS") and are documented and reconciled using PDE data submitted to CMS.

70.     Third, CMS pays a reinsurance subsidy to the Part D Plan Sponsor which is equal to 80 percent of covered drug spending above an enrollee's catastrophic threshold.  By way of example, in 2015, a Medicare beneficiary reached the catastrophic threshold after approximately $7,000 in total drug spending and, once that threshold was reached, CMS paid for 80 percent of the beneficiary's additional drug costs.  CMS uses the PDEs submitted by Part D Plan Sponsors to ensure that Medicare is subsidizing 80 percent of the Part D beneficiaries' catastrophic coverage costs.

71.     Fourth, the Medicare Part D program includes risk-sharing corridors, which seek to limit a plan's overall losses across all enrollees in the event that a plan's spending for benefits is higher than anticipated at the time that the plan submits its bid.  After a reconciliation process conducted at the end of the year, CMS may have to pay additional amounts to a plan if the plan's losses exceed a certain threshold, or CMS may be entitled to

recoup excess profits from a plan whose costs fell short of projections that formed the basis for the direct subsidy payment. This reconciliation process is based on information contained in the PDEs.

72. The payments made by CMS to the Part D Sponsor come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.F.R. §423.315(a).

**D.    Copayments under Medicare Part D**

73. A Part D beneficiary may be required to make a partial payment for the cost of these prescription drugs in the form of a "copayment," "coinsurance," or "deductible" (collectively "copays"). The patient copay obligations in Medicare Part D exist to encourage efficient use of federally reimbursed health care products by health care providers and consumers.

74. Standard Medicare Part D benefits require copays that vary throughout the year depending upon a beneficiary's total Part D covered expenses incurred that year up to that point. *See* 42 U.S.C. §1395w-102.

75. In the first coverage phase, known as the deductible phase, patients are responsible for 100 percent of drug costs until meeting an annual deductible amount (e.g., $250 in 2006). Id. §1395w-102(b)(1).

76. In the second coverage phase, patients pay a 25 percent copay until reaching an "initial coverage limit" (e.g., $2,250 in 2006). Id. §1395w-102(b)(2).

77. In the third coverage phase, known as the "coverage gap" or "donut hole," patient copay obligations are higher until the patient reaches an "annual out-of-pocket threshold" (e.g., $3,600 in 2006). See 42 U.S.C. §1395w-102(b)(2)(D). For brand name drugs,

for example, a patient in the coverage gap owed 100 percent of the cost of the drug through 2010, 50 percent in 2011 and 2012, and 47.5 percent in 2013 and 2014.

78.    In the fourth and final phase of coverage, known as "catastrophic coverage," beneficiaries who do not qualify for LIS pay a copay equaling the greater of 5 percent of the prescription drug cost or a small fixed dollar amount (originally $5 for brand name drugs in 2006). 42 U.S.C. §1395w-102(b)(4).  As described above, the federal government reimburses 80 percent of all prescription drug costs in this "catastrophic coverage" period through a "reinsurance subsidy" provided to the Part D plans; the Part D plans reimburse the remaining 15 percent.

79.    The financial thresholds for the "deductible," "initial coverage limit," and annual "out-of-pocket threshold" have been updated each year since 2006 pursuant to a statutory and regulatory formula.

E.    **Submission of Truthful, Complete, and Accurate Claims to Medicare**

80.    In order to receive Part D funds from CMS, the Part D Plan Sponsors—as well as their authorized agents, employees, and contractors (including pharmacies)—are required to comply with applicable federal laws, regulations, and CMS instructions.  By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. §1395w-112.  Further, CMS regulations expressly require Part D Plan Sponsors to certify, in their contracts with CMS, that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA and AKS. See 42 C.F.R. §423.505(h)(1).

81.    Accordingly, all contracts entered into between CMS and Plan D Plan Sponsors from 2006 through the present include a provision in which the Sponsor "agrees to comply with . . . federal laws and regulations designed to prevent . . . fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. §§3729, et seq.), and the anti-kickback statute (§1127B(b)) of the Act)." Id.

82.    Further, CMS regulations also expressly require that all subcontracts between Part D Plan Sponsors and "downstream" or "related" entities require such entities to perform "any services or other activity" in a manner that "compl[ies] with the Part D Sponsor's contractual obligations," including the Part D Plan Sponsor's contractual obligation to comply with the AKS and False Claims Act. See 42 C.F.R. §423.505(i)(4)(iv).   Moreover, these entities must also operate under contractual obligations to comply with all applicable federal laws, regulations, and CMS instructions. See 42 C.F.R. §423.505(i)(4)(iv).

83.    CMS regulations further require Part D Plan Sponsors to certify to the accuracy, completeness, and truthfulness of the PDE claims data submitted to CMS.  Specifically, the relevant regulatory provision, entitled "Certification of data that determine payment," obligates each Part D Plan Sponsor to certify that "the information CMS relies on in determining payment is accurate, complete and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. §423.505(k).  Compliance with the regulatory requirement that the PDE data submitted to CMS is "true, accurate, and complete" is a condition of payment under the Medicare Part D program.

84.    Since the Part D program began, CMS has required each Part D Plan Sponsor to sign annually an Attestation of Data Relating to CMS Payment to a Medicare Part D Sponsor, which includes a representation that the PDE claims data the Sponsor submits to CMS

is "accurate, complete, and truthful"; the Sponsor has required each subcontractor generating PDE data "to certify that this information is accurate, complete, and truthful based on its best knowledge, information, and belief"; and the Sponsor acknowledges the claims data submitted to CMS "will be used for the purposes of obtaining federal reimbursement and that misrepresentations or omissions in information provided to CMS may result in Federal civil action and/or criminal prosecution." All approved Part D Plan Sponsors who received payment under Medicare Part D in benefit years from 2006 through the present submitted these required attestations in the same or similar format.

85.    With regard to pharmacies and other subcontractors participating in the Medicare Part D program, CMS regulations further provide: "If the claims data are generated by a related entity, contractor, or subcontractor of a Part D Plan Sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. §423.505(k)(3).

86.    Upon information and belief, Defendants have certified (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement.

F.    **The TRICARE Program**

87.    TRICARE (formerly known as CHAMPUS) is a federal health care program, as defined in the AKS, 42 U.S.C. §1320a-7b(f), that is administered by DHA, a component of the DOD. TRICARE provides health care coverage for active duty military personnel, military retirees, and military dependents.

19

88.     TRICARE contracts with Express Scripts, Incorporated ("ESI") to administer the prescription drug coverage of the TRICARE program, including the processing and payment of claims for reimbursement from TRICARE for compounded prescription drugs.

89.     In general, TRICARE pays the pharmacy the average wholesale price for each ingredient in a compounded drug minus a negotiated discount. The reimbursement amount also is based in part on the quantity of each ingredient in the compound.

90.     In order to obtain reimbursement from TRICARE for dispensing compounded drugs, pharmacies submit electronic data claims to ESI. After receiving a claim, ESI adjudicates the claim on behalf of DHA. If the claim is successfully adjudicated, then ESI sends the pharmacy authorization to dispense the drug. ESI also sends DHA a data record of the claim, and, after a holding period, ESI pays the pharmacy on the claim from a government-established and government-funded account created for the purpose of paying TRICARE reimbursement claims. Each claim submitted to ESI for reimbursement of a compounded drug conveys, among other things, information about the patient, the prescriber, the pharmacy, the ingredients in the compounded drug, the price of the ingredients, and the date the prescription was filled.

91.     In order to qualify for reimbursement by TRICARE, a prescription drug must meet the following two requirements, among others. First, the drug must be prescribed for either an FDA-approved indication or be supported by "reliable evidence show[ing] that any medical treatment . . . has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis." 32 C.F.R. §199.4(g)(15).

And, second, the drug must be "medically or psychologically necessary [for] the diagnosis and treatment of illness or injury." 32 C.F.R. §199.4(a)(1)(i).

92.    A pharmacy seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions. 32 C.F.R. §199.9(a)(4).  Fraudulent situations include submitting TRICARE claims for non-covered or non-chargeable services, supplies, or equipment disguised as covered items. Id. §199.9(c)(2).  Abusive situations include the routine waiver of patient copayments and a pattern of claims for services which are not medically necessary or, if medically necessary, not to the extent rendered. Id. §199.9(b)(1), (3).

93.    TRICARE regulations specify that "[a]ll fraud, abuse, and conflict of interest requirements [in section 199.9] are applicable to the TRICARE pharmacy benefits program." 32 C.F.R. §199.21(p).  TRICARE's contract with ESI also incorporates the provisions of 32 C.F.R. §199.

94.    Fraud or abuse by a pharmacy may result in the denial of the pharmacy's claims or the exclusion or suspension of the pharmacy from participation in the TRICARE program. 32 C.F.R. §199.9(b), (f).

95.    Active duty service members do not pay out-of-pocket for prescription drugs. 10 U.S.C. §1074g(a)(2)(F).  All other TRICARE beneficiaries, such as retirees or family members of active duty service members, were at all relevant times responsible for sharing the cost of compounded drug prescriptions filled by a retail or mail-order pharmacy by paying a copayment. Id. §1074g(a)(6); TRICARE Reimbursement Manual, Chapter 2, Addendum B. Copayments currently range from $7 to $53 for prescription drugs filled by a mail-order pharmacy. Id. §1074g(a)(6); TRICARE Reimbursement Manual, Chapter 2, Addendum B.

96.     To receive reimbursement from TRICARE for compounded drugs, a pharmacy must enter into a Provider Agreement with ESI, TRICARE's PBM. A Provider Agreement is essential to TRICARE claims submission. Having a valid Provider Agreement was required in order to submit claims for compounded drug reimbursement to TRICARE. Alternatively, a pharmacy may instead contract with a pharmacy services administrative organization (PSAO) to contract with ESI on the pharmacy's behalf and provide other services that assist the pharmacy in working with ESI.

97.     Upon information and belief, Defendants entered into Provider Agreements or contracts with PSAO in which the Defendants agreed to not engage in fraudulent conduct and to collect all required co-pays.

**G.    Compounding Medications**

98.     At all relevant times, Medicare and TRICARE covered compounded drugs that are medically necessary and proven to be safe and effective.

99.     Compounding is the practice in which a licensed pharmacist or physician combines, mixes, or alters the ingredients of a drug to create a medication tailored to the needs of an individual patient. A patient may need a compounded drug, for example, if she is allergic to an ingredient in a manufactured drug.

100.    Each compounded drug claim submitted by a pharmacy for reimbursement from Medicare and TRICARE generally includes specific representations about the date of service, the patient on whose behalf payment is being sought, the provider who prescribed the medication, and the individual ingredients contained in the compounded drug.

101.    At all relevant times, Medicare and TRICARE beneficiaries were responsible for sharing the costs of compounded drug prescriptions filled by a retail or mail-order pharmacy by paying a copayment.

102.    A pharmacy seeking reimbursement from Medicare and TRICARE must comply with Medicare and TRICARE anti-fraud and abuse provisions.  Fraudulent situations include commission and kickback arrangements.  Abusive situations include the routine waiver of patient copayments.

## VI.    THE FRAUDULENT CLAIMS

### A.    <u>Benzer Franchise Pharmacies</u>

103.    Defendants AJ Nilkanth Gokul LLC, AJ Gokul Nilkanth LLC, Defendant Alawrass LLC, New Haven Pharmacy LLC, Premier Care Pharmacy LLC, Alpha Touch Pharmacy, Inc., Kennedy Drugs LLC, and Victory Pharmacy Of Decatur Inc (collectively "the Benzer Franchise Pharmacies"), with the knowledge and encouragement of Defendant Vinesh Darji, President of Defendant Benzer Franchising, LLC, knowingly and willfully paid remuneration to marketers to obtain referrals for compound drug prescriptions reimbursed by Medicare and TRICARE and engaged in a scheme to provide kickbacks by not collecting co-pays for medications.

104.    By providing kickbacks to induce prescriptions for compounded drugs reimbursed by Medicare and TRICARE, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Medicare and TRICARE programs.

105.    Defendant Benzer was and is utilizing the Benzer Franchise Pharmacies as part of a scheme to engage in a wide-ranging fraud against Medicare and TRICARE.

106.    Defendant Benzer had and has a scheme to defraud Medicare and TRICARE that they refer to as "Footbath."

107.    Hype Med was a pharmaceutical sales and marketing company that made and makes outbound calls to elderly patients for the purposes of soliciting them to get prescriptions for unnecessary medications including the "Footbath" program.

108.    Defendant Eric VanVleet is the President of Hype Med.

109.    Defendant NHS was a company which purports to assist compounding pharmacies in billing and collecting from insurance companies, including Medicare and TRICARE.

110.    Defendant Vinesh Darji of Benzer introduced the owners of the Benzer Franchise Pharmacies to Defendant VanVleet of Defendant Hype Med, who then introduced the pharmacies to Defendant NHS for the purpose of engaging in the fraud.

111.    Upon information and belief, the Benzer Franchise Pharmacies have entered into agreements with NHS to further the fraud or will enter into such agreements.

112.    The Franchise Pharmacies set up a special electronic fax number which is only used for the schemes.

113.    Prescriptions were sent via faxes to this special fax number where they are only received by NHS which then utilized its computers system, called HIVE, to enter the Benzer Franchise Pharmacies computer systems.  NHS then directly input the prescriptions into the Benzer Franchise Pharmacies' computer system.

114.    NHS then submitted the pharmacy claim through the Medicare and TRICARE pharmacy managers claims system to receive the adjudicated response.

115.    After NHS received the adjudicated response, it then alerted the Benzer Franchise Pharmacies to print out the mailing label and ship the medication to the patients.

116.    The below "Table 1" details the most commonly prescribed medications, the estimated cost, the average wholesale price and the possible pay out for the medications.

Table 1

| Medication Name | NDC | Cost (estimated) | AWP | Possible pay out |
|---|---|---|---|---|
| Doxepin Hydrochloride Cream 5% | 40085-'0716-'45 | $7.31/GM | $14.75/GM | $157.39-$1509 |
| Fluocinonide 0.1% | 68462-'0505-66 | $0.93/GM | $19.46/GM | $484.49-$1789 |
| Naproxen | 69097-'0854-'07 | $.05/Tab | $1.06/Tab | |
| Calcipotriene 0.005% | '00781-7117-83/684 62-0501-66 | $1.21/GM | $9.71/GM | $84-$1300 |
| Diclofenas 3% Gel | '0472-1783-10/ 68462-0355-94 | $.46/GM | $11.79/GM | $172-$930 |
| Clobetasol Propionate 0.05% | '00168-'0162-60/ 71085-'0007-60 | $0.8/GM | $9.24/GM | $255-$1500 |
| Lidocaine 5% | 68462-0418-27/503 83-0933-55 | $.23/GM | $8.47/GM | $114-$752 |
| Halobetasol Propionate | 45802-0129-35 | $1.42/GM | $79.58/GM | $92-$294 |
| Chlorzoxazone 250 mg | 69499-0330-60 | $9.50/TAB | $24.77/TAB | $160-$1500 |
| Vancomycin 250 mg capsules | 62559-0391-20/681 80-0167-13 | $1.7/CAP | $57.72/TAB | $184-$4200 |
| Clindamycin Topical Solution 1% | 00168-0201-60/516 72-4081-04 | $.55/ML | $1.31/ML | $139.00 |
| Ketoconazole 2% cream | 51672-1298-02 | $.53/GM | $208.44/GM | $291.00 |
| Dihydro Mesylate Spray | 68682-'0357-'01 | $248.18/ML | $494.06/ML | $211.28-$2268.21 |

117.    Among the most profitable prescriptions which are and were part of the Defendants' scheme are marketed as part of a footbath.

118.    The footbath requires the patient to empty the contents of six (6) capsules of vancomycin (an antibiotic medication) into warm water, add ½ a bottle (30 milliliters) of

25

clindamycin phosphate (an antibiotic typically used to treat acne), and soak their feet for ten to fifteen minutes.  The patients are then to apply ketoconazole cream 2% to their feet.

119.    Vancomycin and clindamycin phosphate are not generally utilized to treat fungus and emptying capsules of medication into a solution is not generally recognized as an effective method to treat patients.

120.    The prescriptions are also written to be auto-refilled multiple times.

121.    These prescriptions were fraudulent and not medically necessary.  Based upon the Relator's experience, the footbath appears specifically designed to be very expensive and to escape detection by fraud screening programs utilized CMS and DHA contractors.

122.    Defendants AJ Nilkanth Gokul LLC, AJ Gokul Nilkanth LLC were active participants in the footbath program.

123.    To secure the prescriptions for the footbaths, Defendants utilized the services of telemedicine companies that do not have actual physician-patient relationships with the beneficiaries.  Defendant Sinikka Green is a physician who signed some prescriptions.

124.    Attached as Exhibit 1 is a partially redacted prescription for the footbath treatment signed by Defendant Sinikka Green dispensed by Gokul Nilkanth LLC.  The phone number on the prescription is associated with Defendant Conclave Media which is a telemedicine business owned by David Santana.

125.    During the fall of 2019, Defendant AJ Gokul Nilkanth LLC submitted multiple claims to Medicare for payment of $14,044.99 for Vancomycin Hcl 250 Mg, $1,192.07 for Clindamycin Ph 1% and $340.48 for Ketoconazole 2% Cream, per month per patient for footbaths.

126.    Of the payment received for the medications, the Benzer Franchise Pharmacies keep approximately 30% with 9% being paid to NHS and the marketing, billing and manufacturing companies receiving the remaining approximately 61%.

127.    Defendants AJ Gokul Nilkanth LLC and AJ Nilkanth Gokul LLC were not collecting co-pays from beneficiaries for the footbath medications.

128.    Defendant NHS was now having Medicare beneficiaries complete a sham survey, which then "pays the patient" and these funds are then utilized to offset the copays which would otherwise be due to Medicare.

129.    The survey was not a real scientific study; rather, it was being used as a means to avoid the requirement to collect co-pays.

130.    Defendants AJ Gokul Nilkanth LLC and AJ Nilkanth Gokul LLC received credit cards which they utilized to pay Medicare co-pays instead of collecting the co-pays from beneficiaries.

131.    Defendants AJ Gokul Nilkanth LLC and AJ Nilkanth Gokul LLC ordered the medications for the footbaths from Defendant Gulf Coast Pharmacy and others.

132.    Premier Care Pharmacy LLC was also an active participant in the NHS footbath scheme.

133.    The owners of Premier Care Pharmacy LLC (who also own Aviva Care Pharmacy, LLC located in Florida) recently advised Relator that they opened Premier Care Pharmacy in Ohio because it was outside of the geographic areas targeted by Health Care Fraud Prevention and Enforcement Action Teams (HEAT).

134.    The owners of Defendant Premier Care Pharmacy LLC also recently advised Relator that they started utilizing a different marketing company for the footbaths because of scrutiny of NHS's practices.

135.    The other Benzer Franchise Pharmacies were actively engaged in the footbath scheme or were preparing to engage in the footbath scheme.

136.    Another fraudulent scheme that Defendant Benzer utilized was known as "Marvel Marketing."

137.    This scheme was designed to be similar to the previously described scheme with Defendant Marvel Marketing providing the Benzer Franchise Pharmacies with fraudulent footbath and other prescriptions and the Benzer Franchise Pharmacies paying approximately 70% of the revenue from the prescriptions to Marvel Marketing, the billing and the drug manufacturing and wholesaling companies.

138.    Relator was advised by Defendant Vinesh Darji that the Marvel Marketing scheme was the same as the footbath scheme but it did not rely upon tele-doctors.

139.    Relator understood this to mean that the scheme involved the Benzer Franchise Pharmacies submitting fraudulent prescriptions for vancomycin, clindamycin phosphate and ketoconazole cream and other high reimbursement prescriptions which were not medically necessary but were being submitted because of the high payment by Medicare and TRICARE for these prescriptions.

140.    With the Marvel Marketing scheme, Marvel Marketing sent the prescription(s) to the pharmacy and the pharmacist enters into their system and then bills Medicare or TRICARE for the mediation.

141.     Other fraudulent schemes that Defendant Benzer was introducing to Benzer Franchise Pharmacies, involve Defendant Medcillary, Telemedicine Corp., One Life and Safe Chain.

142.     These schemes were also designed to be similar to the previously-described scheme with the Benzer Franchise Pharmacies being provided with fraudulent footbath and other prescriptions and the Benzer Franchise Pharmacies paying approximately 70% of the revenue from the prescriptions to the Defendants Medcillary, Telemedicine Corp., One Life and Safe Chain.

143.     With these schemes the Defendants Medcillary, Telemedicine Corp and Safe Chain sent the prescriptions to the Benzer Franchise Pharmacies and the pharmacist entered into their system and then billed Medicare Part D for the fraudulent compounded mediation.

144.     With these schemes the Benzer Franchise Pharmacies were utilizing schemes to avoid collecting co-pays from beneficiaries.

145.     One Life operates what they refer to as "Patient Relief" which is a co-pay avoidance program.

146.     Another co-pay collection avoidance program is associated with Medcillary.

147.     Defendant Darrin Vega advised Relator that he was the owner of Greer and Vega Medical LLC which operated a Benzer Pharmacy franchise in Mobile, Alabama.

148.     Defendant Darrin Vega advised Relator that he was associated with Medcillary.

149.     Medcillary advised Benzer Franchise Pharmacies to create invoices to patients for co-pays and create a statement of account but to engage in no actual efforts to collect the

co-pay. Thus, Medcillary advised the Benzer Franchise Pharmacies to avoid the appearance of waiving co-pays while actually waiving co-pays.

150.    Ben Clester advised Relator that his role as Pharmacy Manager at Medcillary was to audit prescriptions and make sure that prescriptions were going to be approved for payment for the pharmacies.

151.    Clester determines which insurance plans pay for which high priced NDC ("national drug code") drugs.

152.    When insurance companies or pharmacy benefit administrators become aware of the specific NDC's that are being utilized, Medcillary, Redmond and Greer, and Gulf Coast would slightly modify the ingredients of that drug so that a new NDC was created and thus the insurance companies were fooled for another three or four months.

153.    Clester described his job to Relator to keep ahead of the curve by coming up with new formulations.

154.    Defendant Redmond and Greer provided Vinesh Darji at Defendant Benzer with information about specific prescriptions that are being approved by Medicare Part D Plans.

155.    Silverscripts is one of the largest Medicare Part D plans and serves more than five million members.

156.    On or about August 28, 2019, a Pharmacy Consultant at Redmond and Greer provided Vinesh Darji with information about prescriptions that were being approved by Silverscripts approximately 40-50% of the time.

157.   Upon information and belief, this information was shared with marketing firms so that they could place this information on the pre-printed prescriptions that are being completed by doctors.

158.   Bromsite is one of the most dispensed ophthalmology drugs that Benzer corporate stores and franchise owners dispense.

159.   Benzer has a marketing person named John Cox that works with Benzer stores, Sun Pharma (manufacturer of Bromsite) and ophthalmology offices.

160.   John Cox's primary job is to utilize Bromsite to build the prescription business of the Benzer stores.  One of his main strategies is Bromsite.  Specifically, using the Bromsite Patient Assistance program that is found online.

161.   The Bromsite Patient Assistance program is a program which decreases a patient's copay for Bromsite.

162.   The pharmacy must go to the Bromsite.com website and answer questions related to the patient's current insurance status.  Bromsite is NOT valid for Federal health care beneficiary prescriptions that are eligible to be reimbursed, in whole or in part, by Medicaid, Medicare, Tricare or other federal or state healthcare programs (including any state prescription drug assistance programs) but is eligible for Medicare Part D.

163.   When a patient has insurance, the copay is typically between $35 and $158 for Bromsite but when a patient has no insurance the copay is typically $60.

164.   Benzer Pharmacy utilizes a marketing program which lowers the copay of Bromsite (and other brand name drugs such as Inveltys) from $60 to $50.

165.   By doing this Benzer induces ophthalmology offices to switch their referral to Benzer.

166.    In addition, Benzer pharmacies answer the Bromsite Patient Assistance program questions in an untrue and unethical manner, stating that the patient does not have insurance thus Benzer is able to get a co-pay of $60 (which is then discount to $50).

167.    The pharmacies will also adjudicate the Bromsite prescription on the patient's insurance and essentially double dip.

168.    Bromsite prescriptions are accompanied by two other drugs, an antibiotic eye drop and an anti-inflammatory eye drop.

169.    Benzer receives these three prescriptions from physicians and patients because they reduce the amount of the co-pay in the manner described above.

**B. Benasource**

170.    Due to the scrutiny of its fraudulent business practices, Defendants created Benasource, which is presented as a Group Purchasing Organization.

171.    The goal of Benasource was to be able to continue to engage in fraudulent billing by hiding the association of the pharmacies with Benzer.

172.    The Defendants have recently switched their schemes over to Benasource and have undertaken a plan to no longer have associated pharmacies identified as Benzer Pharmacies.

173.    Defendants are working with MTK Marketing which is engaged in the scam of promoting unnecessary medications to patients based upon internet ads.

174.    Unnecessary medications include Pliaglis and Lidocain creams, Diclofenac, Diflorasone Diacetate, Hydrocortisone Butyrate, Flucinonide, Clobetasol, Desoximetasone, Trimcinolone Acetonide, Calcipotriene, Fenoprofen, Ketoprofen, Naproxen, Indomethacin,

Chlorzoxazone, Cyclobenzaprine, Metaxalone, Phalg Rx Skin Emulsion, Calcipotriene, and Luvira.

175.    MTK claims that its employees contact patients to solicit them for medications.

176.    MTK will then provide a prescription to the pharmacy to bill and fill.

177.    Upon information and belief, patients include FB, JM, RS, TB, AH and ST of West Virginia.

178.    Upon information and belief, Defendants are using the Benasource associated pharmacies to provide unnecessary and unwanted prescription medications to these patients.

**FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS**

179.    Relator repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

180.    Throughout the statutory period, Defendants presented claims to CMS, DHA and their contractors for:

        a.    medications that were not medically necessary, but that Defendants presented as medically necessary using false and misleading documents; and

        b.    medications that were illegally induced through offers of remuneration in violation of the AKS.

181.    Defendants knew that these medications were not covered by Medicare, but chose to submit the claims anyway.

182.    For each of its claims for reimbursement, Defendants certified that the information it was providing was true, accurate and complete; and that the claim complied

with all applicable laws, regulations, and instructions for payment.

183.    Each such representation was false, for the reasons described above.

184.    Accordingly, Defendants knowingly presented false or fraudulent claims for payment in violation of the FCA.

185.    The submission by Defendants of these false claims caused CMS and DHA to pay out monies that they would not have paid if they had known of the falsity of Defendants' claims and certifications.

186.    Each false or fraudulent claim thus submitted for payment are a separate violation of the FCA.

187.    By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged in a substantial amount, to be proven at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S. C. §3730(d).

## COUNT TWO

### FEDERAL FALSE CLAIMS ACT: MAKING OR USING
### FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID

188.    Relator repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

189.    As described above, throughout the statutory period, Defendants knowingly used false records and statements when it submitted these claims for payment, including false documentation that Defendants' medications complied with coverage requirements.

190.    Accordingly, Defendants knowingly used false records or statements material to false or fraudulent claims for payment in violation of 31 U.S.C. §3729(a)(l)(B).

191.    The submission of these false records or statements caused CMS and DHA to pay out monies that they would not have paid if it had known of the falsity of Defendants' records or statements.

192.    Each submission of a false record or statement is a separate violation of the FCA.

193.    By reason of the false or fraudulent records or statements that Defendants knowingly submitted, the United States has been damaged in a substantial amount, to be proven at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. §3730(d).

## COUNT THREE

## FEDERAL FALSE CLAIMS ACT: CONSPIRING TO SUBMIT FALSE CLAIMS

194.    Relator repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

195.    As set forth above, Defendants' managers, owners, directors and other employees conspired with each other and unnamed parties to seek and obtain payments by submitting claims based on fraudulent representations and records.

196.    Accordingly, Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of FCA and conspired to commit violations of the FCA.

197.    By reason of the false or fraudulent claims that Defendants conspired to get allowed or paid, or by reason of its conspiracy to violate the FCA, the United States has been damaged in a substantial amount, to be proven at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S. C. §3730(d).

WHEREFORE, Relator respectfully requests that this Court enter judgment in his favor and that of the United States, and against Defendants, granting the following:

(a)    An award to the United States for treble its damages, in an amount to be determined at trial, plus a statutory penalty for each violation of the FCA;

(b)    An award to the United States for its costs pursuant to 31 U.S.C. §3729(a)(3);

(c)    An award to Relator in the maximum amount permitted under 31 U.S.C. §3730(d)

(d)    An award to Relator of his reasonable attorneys' fees, costs, and expenses he incurred in prosecuting this action;

(e)    Awards to the United States and to Relator for their costs of court;

(f)    Awards to the United States and to Relator for pre- and post-judgment interest at the rates permitted by law; and

(g)    An award of such other and further relief as this Court may deem to be just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by the Complaint.

Respectfully submitted,

/s/ Ryan D. Barack
**Ryan D. Barack**
Florida Bar No. 0148430
Primary: rbarack@employeerights.com
Secondary: jackie@employeerights.com
**Michelle Erin Nadeau**
Florida Bar No. 0060396
Primary: mnadeau@employeerights.com
Secondary: jackie@employeerights.com
**Kwall Barack Nadeau PLLC**
304 S. Belcher Rd., Suite C
(727) 441-4947
(727) 447-3158 Fax
Attorneys for Relator

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been provided to the Clerk's Office via U.S. Mail on July 22, 2020 and via email to Michael R. Kenneth, Assistant U.S. Attorney.

/s/ Ryan D. Barack
Attorney